[Cite as *In re L.H.*, 2024-Ohio-2271.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE L.H. | : | |
| | : | No. 113479 |
| A Minor Child | : | |
| | : | |
| [Appeal by C.R., Mother] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** June 13, 2024

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-22905482

*Appearances:*

A.E. Boles LLC and Alisa Boles, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Andrea J. Latessa, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Mother-appellant, C.R. ("Mother"), appeals from the juvenile court's judgment granting permanent custody of her minor child, L.H., to appellee, Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). Mother raises the following assignment of error for review:

1. The trial court's award of permanent custody and termination of appellant's parental rights is against the manifest weight of the evidence.

{¶ 2} After careful review of the record and relevant case law, we reverse the juvenile court's judgment and remand for further proceedings.

## I. Procedural and Factual History

{¶ 3} Mother is the biological parent of the minor child, L.H. (d.o.b. 05/27/2022). The child's biological father is unknown. Just days after L.H.'s birth, CCDCFS filed a complaint for temporary custody, alleging that L.H. was a dependent child as defined in R.C. 2151.04(C) and (D). In support of the complaint, CCDCFS alleged the following set of particulars:

1. Mother is currently incarcerated pursuant to a conviction for aggravated assault with a firearm specification. She is not scheduled to be released until May 9, 2024.

2. Mother has a substance abuse issue. She used marijuana during her pregnancy with the child and tested positive at the birth of the child.

3. Mother has five other children who were adjudicated neglected due in part to Mother's failure to meet their basic needs and medical needs. The children were in the temporary custody of CCDCFS and ultimately committed to the legal custody of a relative.

* * *

6. Alleged father, John Doe, has failed to establish paternity and has failed to support, visit, or communicate with the child since birth.

{¶ 4} Following a hearing held on June 1, 2022, the child was committed to the emergency temporary care and custody of CCDCFS. By entry journalized on October 25, 2022, the child was adjudicated dependent and placed in the temporary custody of the agency. In the order, the juvenile court approved a case plan for

reunification, which was developed by CCDCFS to address ongoing concerns with Mother's substance abuse. The case plan, filed with the court on June 24, 2022, required Mother to "complete a drug and alcohol assessment, and attend, participate and successfully complete any recommended treatment and/or aftercare." Mother was also required to "provide scheduled and random drug screens as requested by [the agency]."

{¶ 5} Less than six months after temporary custody was granted, CCDCFS filed a motion, dated April 5, 2023, to modify the order of temporary custody to an order of permanent custody pursuant to R.C. 2151.413. The motion was supported by the affidavit of Caitlin Golich ("Golich"), an extended-services worker employed by CCDCFS, who averred, in pertinent part:

1. I was assigned the case on or about February 27, 2023;

2. The child was committed to the pre-dispositional temporary custody of CCDCFS on June 3, 2022;

3. The child was adjudicated dependent on October 25, 2022.

4. The child was committed to the temporary custody of CCDCFS on October 25, 2022.

5. A case plan was filed with [the] juvenile court and approved which requires that mother complete a drug and alcohol assessment, complete any recommended treatment or aftercare, and to submit scheduled and random drug screens as requested by CCDCFS.

6. Mother is incarcerated and has been unable to demonstrate case plan compliance. Mother's expected release date is listed as May 9, 2024[.]

{¶ 6} On December 7, 2023, a hearing was held to address the agency's motion for permanent custody. On behalf of the agency, Golich testified that she

was assigned to the child's case in February 2023. Golich outlined Mother's history with the agency and explained the circumstances that caused L.H. to be removed from Mother's care — namely Mother's incarceration until May 2024. Golich further noted that the agency sought emergency temporary custody of L.H. at the time of his birth because Mother tested positive for marijuana, and the agency had previously removed five other children from Mother's care "due in part to [her] failure to meet their basic and medical needs." (Tr. 14.)

{¶ 7} Golich testified that a case plan was developed to assist Mother in addressing the issues that led to the child's removal. The permanency plan was for reunification and required Mother to complete objectives relating to "[alcohol and other drugs ('AOD')] screening and treatment." (Tr. 16.) Golich explained that Mother's case plan only contained one objective because "[Mother] has been incarcerated and * * * has had, you know, limited ability to do things." (Tr. 17.)

{¶ 8} Golich confirmed that she was provided "several completion certificates from multiple programs" that Mother attended while incarcerated. (Tr. 27.) These programs included multicourse seminars relating to parenting and parenting skills. Golich further acknowledged that Mother notified the agency that she "had completed some form of an AOD program" at the prison. (Tr. *id.*) However, Golich was not provided any reports or certificates of completion, and therefore, was unable to confirm whether Mother completed a substance-abuse assessment or inpatient program.

{¶ 9} At the time of the permanent custody hearing, Mother was placed in a halfway house. Mother notified the agency that she has made plans for housing upon her release from the halfway house, however, the agency's process for approving Mother's housing "hasn't gotten that far." (Tr. 29.) Mother further informed the agency that the halfway house has an inpatient program for substance abuse and that "she was working towards figuring out how to enroll in it." (Tr. *id*.) Nevertheless, Golich opined that Mother failed to substantially comply with her case-plan objectives because the agency was unable to verify whether Mother had enrolled in a substance-abuse program. (Tr. *id*.)

{¶ 10} Regarding Mother's interactions with the child, Golich testified that she had a difficult time facilitating a visitation schedule due to communication issues with the incarceration facility. Golich stated that she managed to set up virtual visits for Mother and the child, however, "after several weeks of successful virtual visits, [they] were stopped at the incarceration facility." (Tr. 19.) Thereafter, Golich continued to explore if in-person visits were possible at the facility. However, Golich's efforts proved unsuccessful because she "didn't ever hear back" from the incarceration facility. (Tr. 19-20.)

{¶ 11} Currently, the child is not permitted to live with Mother in the halfway-house facility. However, the facility permits the inmates to have two-hour virtual visits on a weekly basis. Golich testified that "there have been a couple of attempts to do virtual visits, but not very many." (Tr. 30.) When the virtual visits did occur, Mother's interaction with the child was limited given his age. However, Mother

engaged with the caregivers and asked how the child was doing and whether there were any pertinent updates about the child's well-being.

{¶ 12} Finally, Golich provided extensive testimony concerning L.H.'s placement after he was removed from Mother's care. Initially, the child was placed in a foster home. Subsequently, an interested relative was identified and in August 2023, L.H. was placed with his maternal uncle who lives in the state of Michigan. Golich testified that the relative's home is appropriate and that L.H.'s basic and medical needs are being met. Additionally, L.H has bonded with his maternal uncle's family and has enjoyed interacting with the other children in the home.

{¶ 13} Based on the foregoing, Golich maintained that permanent custody in favor of the agency was in the child's best interests based on Mother's failure to remedy the conditions that led to the child's removal from her care. Golich further opined that an extension of temporary custody was not warranted, stating:

> I don't know that there would be time for [Mother] to address the case concern as it stands.

> Additionally, now that she is out of an incarceration facility, there are other historical concerns the agency does believe those need to be addressed, so we would be possibly looking at a case plan amendment to add more concerns because now she might have a chance to address those that she didn't have the chance in her facility. And [L.H.], there is no bond with her.

(Tr. 33.)

{¶ 14} On cross-examination, Golich admitted that L.M. did not have "a great attention span" during the virtual visits based on his young age. (Tr. 35.) She further confirmed that Mother participated in the scheduled visits with L.M. for several

months before the prison abruptly ended the visitation program. Regarding the potential case-plan objectives the agency might add if temporary custody was extended, Golich agreed that the parenting courses Mother completed during her incarceration were consistent with the type of referrals the agency would make if there was a case-plan objective for parenting.

{¶ 15} Golich was also questioned about her face-to-face conversations with Mother after she was transferred to the halfway house in November 2023. Golich stated that Mother mentioned her intention to enroll in a substance-abuse program at the halfway-house facility. Again, Golich reiterated that she had yet to make contact with the halfway house to speak with a representative of the facility about their substance-abuse programs. Nor had the agency made any substance-abuse referrals for Mother since the meeting with Golich occurred. Finally, Golich admitted that because she had yet to speak with a representative of the halfway house, the agency was unable to ascertain whether in-person visits were permissible at the facility.

{¶ 16} Mother testified on her own behalf at the hearing. She stated that she was incarcerated in Marysville prison for 18 months and has been residing in a halfway house for approximately one month. Mother testified that she participated in three virtual visits with the child while she was incarcerated. After the child was placed with his maternal uncle, Mother made attempts to schedule virtual visits with the child through a "video visit app." (Tr. 49.) Mother stated that she participated in three virtual visits with the child through the video application and has

consistently called and texted her brother's wife to receive updates about L.H. She maintained, however, that there have been communication issues with her family and that "they're not very good at picking up the phone or responding back right away." (Tr. 50.) Mother further stated that her family was "disconnected" and "didn't take the time to give [her] the opportunity" to schedule visits or have contact with L.H. (Tr. 51-52.) Mother testified that she notified her brother that she could have in-person visits with the child in the halfway house if he filled out an application with the facility. As of the time of the permanent custody hearing, Mother was unaware if her brother had attempted to contact the halfway house on her behalf. And, as conceded by Golich, the agency failed to assist the parties in effectuating visitation at the facility.

{¶ 17} With respect to her case-plan objective for substance abuse, Mother maintained that she last used marijuana three months before L.H. was born and has not used drugs in well over a year and a half. Nevertheless, Mother testified that she is on a waitlist for inpatient services at the halfway house and has had two negative drug tests. Mother is currently enrolled in "Job Readiness and Thinking for a Change Cognitive classes" and recently obtained employment at a restaurant. (Tr. 53.) In addition, Mother is working towards obtaining appropriate housing upon her release through an organization called Reach Success.

{¶ 18} Mother stated that her release date from the halfway house is April 19, 2024. However, Mother became eligible to be placed on house arrest in January 2024. Mother testified that upon her release, she plans to continue her employment

and finish any necessary classes. She also intends to seek "more regular in-person visits" with L.H. (Tr. 54.) When asked what she has learned since her incarceration, Mother stated, "[M]y focus is my children and bettering myself and being successful." (Tr. 55.) Thus, Mother opined that if temporary custody was extended, she would have the ability to demonstrate to the court and the agency that she is able to provide a safe home for L.H. in the reasonable future.

{¶ 19} At the close of trial, the juvenile court heard from child's guardian ad litem, Alix Wintner, Esq. (the "GAL"). Consistent with the recommendations of the agency, the GAL recommended that permanent custody be granted in favor of CCDCFS. The GAL summarized her position, stating, in relevant part:

> You Honor, this is a sad case.
>
> Mom gave birth and then spent the next two and a half years in prison. She wasn't able to see her child, and then he was a young toddler. Virtual visits are not satisfying for either the mother or the child. I think they're — I don't want to say worthless because I think at least they're seeing each other, but it doesn't go very far to develop and help develop the relationship and bond that mother and child should have.
>
> But in the meantime, this child is currently placed with mom's family. Whenever I spoke with them, they have indicated that they would have no problem, in fact they would encourage visits with mom, letting mom develop a relationship with [L.H.], and I just think that is in his best interest.
>
> * * *
>
> I know her history because I was also the guardian ad litem on the other children who at one point were on the cusp of going to permanent custody until the relative came in and she did take legal custody of all of them. But mom was having a lot of problems at that time. And then she now spent a year and a half in prison. She's in a halfway house.

I just am not all that confident that she's gonna be able to come around in the next five, four and a half months where she would be able to assume custody of [L.M.] So for that reason I am recommending permanent custody.

(Tr. 66-67.)

{¶ 20} In a journal entry dated December 12, 2023, the juvenile court granted the agency's motion for permanent custody and terminated Mother's parental rights.

{¶ 21} Mother now appeals.

## II. Law and Analysis

{¶ 22} In the sole assignment of error, Mother argues the trial court's decision to terminate her parental rights and grant permanent custody in favor CCDCFS is against the manifest weight of the evidence.

### A. Permanent Custody Standard

{¶ 23} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child, *In re Murray*, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and the right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the

polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 24} Because the termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" it is "an alternative [of] last resort." *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14; *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21.  It is, however, "sanctioned when necessary for the welfare of a child."  *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994).  All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'"  *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996).  Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children."  *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

{¶ 25} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody.  *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 20 (8th Dist.), citing R.C. 2151.414(B).  This first prong of this statute authorizes the juvenile court to grant permanent custody of a child to the

public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e).

{¶ 26} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D). "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 27} The Supreme Court of Ohio has clarified the standard of review in permanent custody cases, explaining that

> [g]iven that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, * * * the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.* at ¶ 11.

{¶ 28} With respect to Mother's challenges to the weight of the evidence supporting the juvenile court's judgment in this case, the Ohio Supreme Court stated, in relevant part:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.]. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

{¶ 29} Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re P.S.*, 8th Dist. Cuyahoga No. 111817, 2023-Ohio-144, ¶ 30, citing *In re C.N.*, 10th Dist. Franklin No. 15AP-67, 2015-Ohio-2546, ¶ 9, citing *State v. Howze*, 10th Dist. Franklin No. 13AP-386, 2013-Ohio-4800, ¶ 10.

### 1. First Prong — R.C. 2151.414(B)

{¶ 30} With respect to the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(d), that L.H. has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period. The court observed that L.H. "has been in temporary custody since October 23, 2022."

{¶ 31} For purposes of this provision, "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1)(e). In addition, when calculating whether a child has been in an agency's temporary custody for the requisite time, "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26. In other words, "the time-period for R.C. 2151.414(B)(1)(d) is calculated from when the child enters custody of the

agency and the filing of the motion for permanent custody." *In re J.C.*, 8th Dist. Cuyahoga No. 106272, 2018-Ohio-2234, ¶ 29, citing *In re C.W.* at ¶ 26.

{¶ 32} In this case, L.H. was removed from Mother's care at the time of his birth on May 27, 2022, and was placed in the emergency temporary custody of the agency on June 1, 2022. He was subsequently adjudicated dependent and placed in the temporary custody of the agency on October 25, 2022. Thus, applying either date contemplated under R.C. 2151.414(B)(1)(e), the child was not in the agency's temporary custody for 12 or more months of a consecutive 22-month period when the agency filed its motion for permanent custody on April 5, 2023. We recognize that the court was permitted to note the overall length of time during which L.H. was in temporary custody, insofar as the court was simply outlining his custodial history. *See In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 43 (8th Dist.). However, to the extent the court's finding that L.H. "has been in temporary custody of a public children services agency * * * for twelve or more months of a consecutive twenty-two month period" was stated as a basis to establish the first prong for an award of permanent custody under R.C. 2151.414(B)(1)(d), the court erred. *See In re R.G.*, 8th Dist. Cuyahoga No. 108537, 2020-Ohio-3032, ¶ 23.

{¶ 33} Alternatively, however, the court found by clear and convincing evidence that L.H. cannot be placed with either of the child's parents within a

reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a).[1]

{¶ 34} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re A.V.*, 8th Dist. Cuyahoga No. 101391, 2014-Ohio-5348, ¶ 58; *In re R.M.*, 8th Dist. Cuyahoga Nos. 98065 and 98066, 2012-Ohio-4290, ¶ 14; *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919, ¶ 13.

{¶ 35} Relevant to this appeal, R.C. 2151.414(E) provides, in part:

If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

---

[1] As findings under R.C. 2151.414(B)(1)(a) and 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Daltoni*, 5th Dist. Tuscarawas No. 2007 AP 0041, 2007-Ohio-5805.

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.[2]

* * *

(16) Any other factor the court considers relevant.

*Id.* A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent. *In re Ca.T.*, 8th Dist. Cuyahoga No. 108969, 2020-Ohio-579, ¶ 27, citing *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 42.

{¶ 36} In this case, the juvenile court's judgment entry did not specifically state which factors it considered under R.C. 2151.414(E). Nevertheless, the trial court made corresponding findings of fact, stating, in relevant part:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, Mother and alleged father have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

---

[2] As stated, the juvenile court's journal entry repeatedly references Mother's incarceration. While R.C. 2151.414(E)(12) contemplates a parent's incarceration, the 18-month time period referenced in this factor does not apply to the procedural posture of this case.

Mother was recently released from prison and is currently residing in a halfway house where children are not permitted.

Mother has neglected the child between the date of the original complaint was filed and the date of the filing of this motion by failure to regularly visit and support the child.

* * *

Mother had given birth to the child in prison and was unable to demonstrate case plan compliance. She is currently in a halfway house where children are not allowed.

{¶ 37} On appeal, Mother does not dispute "that the child cannot *presently* be placed with either parent" because she does "not yet have housing that could accommodate the child" and "L.H.'s father is unknown." Nevertheless, Mother contends that there "is still available time" for her to show

> by clear and convincing evidence that the child can and should be placed with [her] in a reasonable period of time, [and] it was not necessary or in the child's best interests to sever [her] parental rights as nearly six months remain before the expiration of the two-year term of temporary custody.

Mother states that her "primal connection" with the child is "indisputable" and that "she stands ready to demonstrate how she has benefitted from services." Mother further notes that she (1) "began seeking both housing and employment upon her release to a halfway house," (2) "has made every effort to visit with L.H. despite * * * being limited by bureaucratic 'red tape,'" (3) is on a waitlist for an inpatient program, and (4) "has been taking and passing drug tests."

{¶ 38} In contrast, CCDCFS argues the trial court's findings pursuant to R.C. 2151.414(E)(1) and (4) "are supported by the evidence in the record." Specifically, the agency contends that (1) Mother "made minimal progress in addressing her

substance abuse concerns," (2) has "not successfully engaged in any substance abuse services throughout her [incarceration]," (3) has "failed to appropriately set up video visitations with L.H. in his relative placement when given the opportunity to do so," and (4) "is currently residing in a halfway house where children are not permitted."

{¶ 39} Typically, the "diligent efforts" contemplated under R.C. 2151.414(E)(1) are set forth in a case plan adopted pursuant to R.C. 2151.412. The goals of any case plan are (1) to achieve a safe out-of-home environment for the children during their removal, and (2) eliminate with all due speed the need for an out-of-home placement so that the children can return home. R.C. 2151.412(G)(1). *See also In re M.B.*, 8th Dist. Cuyahoga Nos. 101094, 101095, and 101096, 2014-Ohio-4837, ¶ 29. *Accord In re J.L.*, 8th Dist. Cuyahoga Nos. 85668, 85669, and 85670, 2005-Ohio-6125, ¶ 18 (considering whether CCDCFS case plan was adequate).

{¶ 40} Similarly, "reasonable efforts" refers to "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed.'" *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003); *In re L.G.*, 8th Dist. Cuyahoga No. 110789, 2022-Ohio-529, ¶ 60. "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 3d Dist. Wyandot

Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. "In other words, the agency must use reasonable efforts to help remove the obstacles preventing family reunification." *In re L.G.* at ¶ 60, citing *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 76.

{¶ 41} What constitutes "reasonable efforts" varies with the circumstances. *In re C.B.C.* at ¶ 76. "The issue in a reasonable-efforts determination is not whether the agency could have done more, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case." *In re A.F.*, 8th Dist. Cuyahoga No. 110503, 2021-Ohio-4519, ¶ 35. "'"Reasonable efforts" does not mean all available efforts.'" *In re J.B.,* 8th Dist. Cuyahoga No. 109039, 2020-Ohio-3675, ¶ 21, quoting *In re Lewis*, 4th Dist. Athens No. 03CA12, 2003-Ohio-5262, ¶ 16. "Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *Lewis* at ¶ 16; *In re K.W.*, 8th Dist. Cuyahoga No. 106700, 2018-Ohio-3314, ¶ 45.

{¶ 42} Upon careful consideration, we do not find that clear and convincing evidence supports the conclusion that, notwithstanding the agency's reasonable planning and diligent efforts, Mother has failed continuously and repeatedly to substantially remedy the conditions causing placement of the child outside of the home.

{¶ 43} Undoubtedly, the record established that Mother has been incarcerated during the entirety of these proceedings and was not set to be released

from custody until April or May 2024.  During her incarceration, however, Mother has demonstrated a willingness to address the issues that have plagued her in the past and has attempted to develop a bond with her young child despite the inherent hurdles associated with being incarcerated.

{¶ 44} In this case, Mother's only case-plan objective concerned substance-abuse services based on her history of marijuana use.  The testimony adduced at trial established that Mother has not used marijuana since early 2022 and has consistently passed random drug tests during the term of her incarceration.  Although Mother was unable to complete a substance-abuse assessment while in prison, she took it upon herself to enroll in an inpatient-service program offered by the halfway-house facility.  Mother further indicated that she completed a drug and alcohol program while in prison; however, the agency did not take the necessary steps to communicate with the prison facility to verify Mother's progress.  At trial, Golich provided little information concerning the efforts made by the agency to assist Mother in addressing her case-plan objectives since it was approved in October 2022.  Significantly, the agency has made no recent referrals on Mother's behalf and Golich admitted that she has not contacted the halfway house to verify Mother's enrollment in the inpatient AOD program at the facility.  (Tr 41.)  Thus, in the ten months Golich was assigned to this case, the agency failed to take the necessary steps to independently confirm Mother's progress during her incarceration and whether the facilities offer any programs that would address the concerns designated in the case plan.  On this record, it is unclear what actions

Mother could have taken to comply with her case-plan objectives for reunification or that the agency diligently provided her with a reasonable opportunity for reunification.

{¶ 45} We are equally unpersuaded by the evidence supporting the court's conclusion that Mother has demonstrated a lack of commitment toward the child by failing to regularly support or visit the child. Here, the testimony presented at trial demonstrated that Mother participated in virtual visits with the child until the prison facility unexpectedly determined that virtual visits were no longer feasible. Thereafter, Mother notified the agency about the possibility of in-person visitation with the child, but Golich failed to coordinate with the prison to effectuate in-person visitation. Golich testified that she reached out to the prison but "never heard back" from the representative at the incarceration facility. (Tr. 19-20.) Similarly, Golich had yet to "ascertain" whether it was possible for Mother to have in-person visits with the child during her time at the halfway house. (Tr. 42-43.) Mother has, however, participated in virtual visits with the child through an application service that she is required to pay for. Mother has expressed her desire to engage in these visits more frequently but is limited by the availability and schedule of the child's current custodians. Collectively, the forgoing circumstances do not demonstrate a lack of commitment to the child. Rather, they reflect the inherent realities of incarceration and Mother's attempt to assimilate to circumstances that are out of her control.

{¶ 46} Lastly to the extent that Golich inferred that the agency would add additional components to Mother's case plan if a six-month extension of temporary custody was ordered, our review is limited to the allegations in the permanent custody motion and the case plan that existed at the time of the hearing. With that stated, however, the record reflects that Mother has taken steps on her own to address issues that previously caused her other children to be removed from her care. For instance, Mother has completed two parenting courses, obtained employment, has enrolled in a job readiness course, and is working with an organization called Reach Success to facilitate appropriate housing.

{¶ 47} In conclusion, following our review of the record and the controlling caselaw, we find the manifest weight of the evidence does not support the first prong of the required showing for a termination of parental rights. *See, e.g., In re S.D.*, 1st Dist. Hamilton Nos. C-200045 and C-200084, 2020-Ohio-3379, ¶ 73 (the court need not consider the second prong of the analysis if the first prong is not satisfied). Accordingly, the sole assignment of error is sustained.

{¶ 48} The judgment of the trial court is reversed, and the matter is remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
MICHAEL JOHN RYAN, J., CONCUR