[Cite as *In re K.L.*, 2026-Ohio-266.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE K.L.                                    :

                                       No. 115381

A Minor Child                                 :

[Appeal by Mother]                            :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 29, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-23909622

---

### *Appearances:*

Dawn Snyder, LLC, and Dawn Snyder, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Appellant-Mother ("Mother") appeals from the juvenile court's decision awarding permanent custody of her minor child, K.L. ("the child"), approximately 22 months old at the time of trial, to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency") after a hearing on the

agency's motion to modify temporary custody to permanent custody. After a complete review of the record, we affirm the juvenile court's decision.

{¶ 2} On August 23, 2023, CCDCFS filed a complaint alleging abuse and dependency and requesting temporary custody of the child. The complaint indicated that at the time of the child's birth, the child tested positive for drugs and suffered withdrawal symptoms, from which the child was still hospitalized. As to the allegations regarding Mother, the complaint alleged that she (1) suffered from substance-use issues with fentanyl and marijuana that she used during her pregnancy; (2) lacked basic needs to provide care for the child, including stable housing and necessary provisions; (3) suffered from mental-health disorders, which she had been inconsistently addressing; (4) had other children "adjudicated" and committed to the legal custody of a relative; and (5) had unresolved legal issues related to her prior felony convictions. As to the allegations regarding the alleged Father, the complaint alleged that he failed to establish paternity, and visit, support, or communicate with the child.

{¶ 3} A magistrate conducted a hearing on this same day at which Mother did not appear, despite Mother calling the court to confirm the hearing. Based on the testimony received and the allegations contained in the complaint, the court granted the agency's request for emergency predispositional temporary custody.

{¶ 4} On October 5, 2023, CCDCFS filed an amended complaint alleging abuse and dependency and requesting temporary custody of the child. The amended complaint's allegations were relatively the same regarding the child and

Mother but added allegations against the child's alleged Father. The complaint clarified that Mother and alleged Father had four older children that were adjudicated due in part to both parents' substance abuse and Mother's mental-health issues. As to the allegations specifically regarding the alleged Father, the complaint alleged that he was (1) currently incarcerated with pending charges; (2) on probation for multiple felony convictions; and (3) failed to establish paternity.

{¶ 5} Following a hearing on January 4, 2024, the juvenile court adjudicated the child abused and dependent and granted the agency temporary custody of the child.[1] Neither Mother nor alleged Father attended the hearing. It was reported that Mother's absence was because she left the area because of purported physical abuse by the child's alleged Father. At the hearing, testimony was offered that Mother had an active warrant for her arrest and was expelled from a halfway house. CCDCFS social worker, Ebony Sheffey, testified that she had contact with Mother. According to extended case worker, Mark Pountney, Mother failed to (1) follow up with assessments; (2) sign the requested release of information; (3) verify her address; and (4) visit the child since birth. The agency's case plan noted that Mother would not tell the agency her whereabouts in fear of being arrested, did not agree with the case-plan services, and believed the child should not have been removed from her care. The agency's case-plan objectives included (1) substance-use assessment; (2) mental-health assessment; (3) domestic-

---

[1] The record reflects that obtaining service on Mother and alleged Father was problematic.

violence counseling; (4) parenting classes; and (5) basic needs. The child's guardian ad litem ("GAL") opined that temporary custody to the agency would be in the child's best interest.

{¶ 6} In March 2024, the agency filed its semiannual administrative review. The review noted that Mother reported that she was enrolled and actively working through the services offered at Green Leaf and was nearly done with the program. She reported she submitted to drug testing, and attended counseling, therapy, and parenting classes. Mother, however, could not provide the agency with a sobriety date. She stated that she was staying with a friend and available for weekly visits with the child. She further stated that she "cleared up" her active warrants before Christmas. Per the review, the agency needed to obtain a release of information to verify Mother's assertions, and according to Mother, nothing prevented her from meeting with the agency and signing the release. Despite Mother's statements, the agency reported that Mother failed to follow through with their requests, including visiting with the child.

{¶ 7} On August 8, 2024, the agency moved to modify temporary custody to permanent custody, contending that Mother failed to engage in any of the required case-plan services and failed to visit with the child and that the alleged Father failed to establish paternity and was currently incarcerated.

{¶ 8} On August 12, 2024, the court held a review hearing at which Caitlin Golich ("Golich"), the child's assigned CCDCFS case worker, testified. She stated that the agency had not received any documentation from Mother regarding her

engagement in services. She stated that the agency had been limited in making referrals for Mother because Mother had not executed a release of information to allow the agency to release Mother's personal information — Mother had been asked twice to sign the release. Golich further testified that although Mother reported that she was working with Green Leaf, an agency in Akron, Mother had failed to provide any details, contact information, counselor names, or phone numbers. Golich stated that when she tried to contact Green Leaf directly, she was "shut down very quickly by them saying they don't [give out information or facilitate signing a release]." (Aug. 12, 2024; tr. 8.) She stated that the two times she spoke with Mother, Mother stated that she could not visit with the child until she resolved her "legal stuff." (*Id.*; tr. 9.) Despite being given the opportunity, Mother had not visited the child since birth. Golich offered testimony that Mother's cousin had been identified as a viable placement for the child, but no visits with cousin had occurred yet.

{¶ 9} On August 22, 2024, an amended case plan was filed because "kinship placement has been identified and approved by the agency. [The child] will begin visitations with kinship with the goal of moving [the child] to a less restrictive environment." In November 2024, the agency withdrew this amended case plan, following the receipt of a video demonstrating poor judgment on the part of the potential relative placement.[2]

---

[2] The video was discussed and reviewed at the September 17, 2024 status hearing.

{¶ 10} During this time frame, the court appointed counsel for both Mother and the alleged Father and granted the agency's motion for genetic testing to establish paternity. Paternity was subsequently established in November 2024.

{¶ 11} On February 4, 2025, the court conducted an arraignment hearing on the agency's complaint and motion to modify temporary custody to permanent custody. Both Mother, who was serving a prison sentence at the Ohio Reformatory for Women, and Father appeared before the court with counsel. The matter was continued for trial.

{¶ 12} On June 13, 2025, the juvenile court conducted a trial on the agency's motion for permanent custody. Mother, who was still serving a prison sentence at the Ohio Reformatory for Women, attended the hearing and expressed her desire to proceed without assigned counsel. Father also attended the hearing and expressed dissatisfaction with assigned counsel but ultimately agreed to proceed with counsel. The agency presented testimony from (1) Golich, (2) Danielle Smith, a family advocate, and (3) Nancy Sin, the child's GAL. Father and Mother also testified.

{¶ 13} Relevant to the appeal, the court heard the following testimony.[3]

{¶ 14} Golich testified that the child had been in agency custody since his release from the hospital in August 2023. She stated that during this time, Mother did not sign her case plan, appear for any assessments, or visit with the child. Although Mother advised her during their two telephone conversations that she was

---

[3] Father has not appealed. Accordingly, only the testimony relevant to Mother's appeal will be discussed.

working on programs through Green Leaf, she never provided Golich with any documentation, nor did she sign a release to allow the agency to verify Mother's participation.

{¶ 15} Golich further testified that Mother advised her that she could not visit with the child because she had active arrest warrants. In fact, Mother was incarcerated in August 2024 serving a prison sentence with an expected release date of February 2026. Golich stated that she contacted individuals at the prison to coordinate visitation with Mother and the child, but her attempts were unsuccessful. She stated that despite leaving messages, no phone calls were returned. Golich stated that in addition to making phone calls, she sent letters to Mother, requesting Mother to have her case manager contact Golich to arrange visitation.

{¶ 16} Regarding the child, Golich testified that he had been in agency custody since birth. The child was born with a mass on his liver that required consistent monitoring and also suffered from asthma that required treatments. She said that the child had been with the same foster family and any potential placement with relatives was unsuccessful. Golich stated that the child's foster family meets his basic and medical needs and that the child "demonstrates a very secure attachment to his foster family. I also want to say he demonstrates a very secure secondary attachment to like the neighborhood as a whole. He's got a foster brother who's a little bit older. Friends come over. They all play, and you know, he's an unknown person. He's very attached." (June 13, 2025; tr. 36.)

{¶ 17} Danielle Smith, the CCDCFS family advocate assigned to the child's case, testified that she only spoke with Mother once during the pendency of the case. During this conversation, Mother advised her that she was being released from prison soon and that she was looking for housing to remove herself from the domestic violence situation with Father.

{¶ 18} Mother provided a statement to the court, denying that Golich ever contacted her or her case worker while she was in prison. She stated that she was granted early release for good behavior and was scheduled to be released from prison on July 28, 2025. Mother stated that she completed all of her required objectives for domestic violence, parenting, and mental-health assessments and was currently taking medications to treat her mental health and substance use. She stated that her family was going to help her obtain stable housing. Regarding her other four children, she stated that although Summit County Children Services were involved, she voluntarily relinquished her children to her family's care while she was incarcerated. Mother expressed her desire to care for the child and if the child could not be placed with her, then the child should be with Father.

{¶ 19} The GAL submitted a report prior to trial. During the trial, the GAL stated that she had been with the case since the beginning, but yet only spoke to Mother once. According to the GAL's report, Mother stated that she would send documentation that she completed all of her case-plan requirements, but the documents submitted to the GAL did not involve the case-plan requirements.

**{¶ 20}** Regarding the child, the GAL noted the child's health concerns, but that he was "achieving all of his growth milestones." The report provided that

> [t]he child is attending daycare and is socially involved. The child's needs are being met by foster family. He is thriving in the foster home and has established a significant bond with the foster family. The foster family [is] able and willing to adopt him. They will be able to provide a legally secure permanent placement, steady income for basic needs, and a nurturing environment for the child's needs.

The GAL opined that granting permanent custody to the agency would be in the best interest of the child.

**{¶ 21}** On July 3, 2025, the juvenile court granted the agency's motion to modify temporary custody to permanent custody, terminating Mother and Father's parental rights. This appeal followed.

## I.    The Appeal

**{¶ 22}** Mother's sole assignment of error states:

> The [juvenile] court erred and abused its discretion in finding that it would be in the best interests of the child to permanently terminate the parental rights of Mother and place the child in the permanent custody of CCDCFS.

The issue she specifically presents is "that the [juvenile] court's finding that the child cannot be placed with Mother within a reasonable time or cannot be placed with Mother was against the manifest weight of the evidence."

**{¶ 23}** Challenges to the manifest weight of the evidence require the appellate court to "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a miscarriage of

justice that the judgment must be reversed, and a new trial ordered." *In re Z.C.*, 2023-Ohio-4703, ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 24} R.C. 2151.414 permits a juvenile court to modify a child's temporary custody with a public services agency to permanent custody if, after a hearing, the court determines by clear and convincing evidence that (1) one of the factors enumerated in R.C. 2151.414(B)(1)(a) through (e) are applicable and (2) permanent custody to the agency is in the best interest of the child. Clear and convincing evidence is evidence that produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re T.B.*, 2014-Ohio-2051, ¶ 28 (8th Dist.).

{¶ 25} Regarding the first factor, the juvenile court found that R.C. 2151.414(B)(1)(a) applied, which provides in relevant part, that "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."

{¶ 26} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re K.G.*, 2026-Ohio-127, ¶ 14 (8th Dist.). If any one or more of the R.C. 2151.414(E) factors are found by clear and convincing evidence, the court "*shall* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." (Emphasis added.) R.C. 2151.414(E); *see In re J.S.*, 2022-Ohio-4517 (8th Dist.).

{¶ 27} In support of the first prong, as applied to Mother, the juvenile court found the factors under R.C. 2151.414(E)(1) and (10) applicable. These provide:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

. . .

(10) The parent has abandoned the child.

{¶ 28} Specifically, the juvenile court found that Mother had not completed any case-plan services and had not visited with the child. Further, the court stated that Mother was incarcerated in August 2024 and her expected release date was in February 2026. The court also noted a history of domestic violence between the parents — a history that Mother admitted. Finally, the court stated that Mother refused to disclose a verifiable address and that Mother had concerns about housing once released from prison.

{¶ 29} These findings are the focus of Mother's appeal, contending that they are contrary to law and against the manifest weight of the evidence. Our review of the record reveals that the juvenile court's finding that the child cannot be placed with either of the child's parents within a reasonable time or should not be placed

with the child's parents was supported by clear and convincing evidence and thus supported by the weight of the evidence.

{¶ 30} Golich testified that the agency did not have any documentation or verification that Mother completed any of her case-plan services, which included substance-abuse services, mental-health and domestic-violence counseling, and housing. Mother disputed this testimony, contending that she participated in the requisite programs before she was incarcerated and completed her case-plan objectives while she was incarcerated. Mother did not offer any documentation to the juvenile court substantiating her claims.

{¶ 31} A review of the entire record reveals that prior to Mother's incarceration, she advised CCDCFS case workers that she was participating in programs at Green Leaf in Akron, Ohio. The agency repeatedly documented that they were unable to verify this information because of Mother's failure to sign the requisite release of information — this lack of release was first documented in January 2024 before Mother was even incarcerated. Accordingly, Mother's attempt to fault the agency for failing to verify whether she participated in or completed her case-plan objectives is unpersuasive. No evidence was submitted supporting Mother's claims that she completed her case-plan objectives. Accordingly, the juvenile court's finding that Mother failed to substantially remedy the conditions causing the child's removal pursuant to R.C. 2151.414(E)(1) was supported by the record.

{¶ 32} The juvenile court's finding that Mother failed to visit with the child is undisputed. Mother admitted that she had not visited the child since his discharge from the hospital, which was in August 2023. The child was almost two years old at the time of the permanent custody trial.

{¶ 33} Mother focuses her arguments on the agency's failure to coordinate visitation with her and the child while she was incarcerated. However, Mother neglects to appreciate that she did not visit with her child prior to incarceration, which was not the fault of the agency. From August 2023 until Mother's incarceration in August 2024, Mother failed to exercise any visitation with her child because she knew she had active warrants for her arrest.

{¶ 34} Accordingly, the juvenile court's finding that Mother abandoned the child pursuant to R.C. 2151.414(E)(10) was supported by clear and convincing evidence. A child is "presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C). In this case, Mother had not visited the child for almost two years.

{¶ 35} Finally, insofar as Mother challenges whether the agency made "reasonable efforts" or "diligent efforts" to assist Mother with her case-plan objectives, relying on this court's decision in *In re L.H.*, 2024-Ohio-2271 (8th Dist.), we find the arguments unpersuasive. Although the facts and the parties appear similar to this case, the key distinction in *L.H.* was that L.H.'s mother was no longer incarcerated at the time of the permanent custody hearing, maintained visitation

with her child, and had verifiably completed some of her case-plan objectives. Moreover, the agency worker testified that the agency had not made certain referrals for L.H.'s mother or contacted the halfway house to establish visitation. Based on those facts, this court found that mother did not demonstrate a lack of commitment to the child — contrary to the juvenile court's findings. *Id.* at ¶ 45.

{¶ 36} These identified facts in *L.H.* are significant because in the case before this court, Mother was still incarcerated at the time of the permanent custody hearing and not scheduled to be released from incarceration until February 2026. Although Mother testified that she anticipated being released on good behavior in six weeks, this information was not supported by any documentary evidence and Mother did not request a continuance of the permanent custody hearing on this basis. Moreover, Mother was not incarcerated during the entirety of the child's life and pendency of the case. Mother, unlike L.H.'s mother, had the opportunity to visit with the child for the entire first year of the child's life and start her case-plan objectives. Mother failed to do so. Accordingly, we find *L.H.* distinguishable.

{¶ 37} Based on the evidence demonstrating Mother's failure to complete her case-plan objectives and Mother's abandonment of the child, the juvenile court's finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent is supported by clear and convincing evidence and thus, not against the manifest weight of the evidence.[4] Mother has not

---

[4] Father has not appealed, and Mother raises no arguments as they pertain to Father. A cursory review of the juvenile court's findings as they pertain to Father were also supported by clear and convincing evidence. Father was incarcerated for a majority of the

raised any argument on appeal challenging the juvenile court's best-interest determination under R.C. 2151.414(D)(1). Accordingly, that finding will not be addressed. Mother's assignment of error is overruled.

{¶ 38} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

EMANUELLA D. GROVES, P.J., and
EILEEN A. GALLAGHER, J., CONCUR

---

child's life and when finally released and paternity established, his visits with the child were sporadic. Testimony was presented that Father had not completed any verified assessments and had not made any progress on his case-plan objectives.